McFarland Ritter PLLC
Ryan T. McFarland, ISB No. 7347
Maren E. Adams, ISB No. 9684
P.O. Box 1335
Meridian, ID 83680
Telephone: 208.895.1291
Facsimile: 208.895.1270
Email: ryan@mcfarlandritter.com
        maren@mcfarlandritter.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CRAIG H., and A.H., | ) |
| Plaintiffs, | ) Case No. 1:23-CV-00221-DCN |
| | ) |
| vs. | ) **AMENDED COMPLAINT** |
| | ) |
| BLUE CROSS OF IDAHO, DBA BLUE | ) |
| CROSS OF IDAHO; BLUE CROSS OF | ) |
| IDAHO CARE PLUS, INC.; BLUE CROSS | ) |
| OF IDAHO FOUNDATION FOR HEALTH, | ) |
| INC.; BLUE CROSS OF IDAHO HEALTH | ) |
| SERVICE, INC., and MICRON | ) |
| TECHNOLOGY, INC., a Delaware | ) |
| corporation, MICRON TECHNOLOGY, INC. | ) |
| HEALTH AND WELFARE BENEFITS | ) |
| PLAN, MICRON TECHNOLOGY, INC. | ) |
| SELF-INSURED GROUP HEALTH PLAN, a | ) |
| Constituent Plan of the Micron Technology, | ) |
| Inc. Health and Welfare Benefits Plan, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiffs Craig H. and A.H. (referred to herein as "the H. Family"), by and through their

attorneys of record, McFarland Ritter PLLC, plead and complain as follows:

## I. PARTIES

1.      Plaintiff Craig H. is a resident of Idaho and the father of Plaintiff A.H., a minor.

2.      Defendants Blue Cross of Idaho, dba: Blue Cross of Idaho; Blue Cross of Idaho Care Plus, Inc.; Blue Cross of Idaho Foundation for Health, Inc., and Blue Cross of Idaho Health Service, Inc. (hereinafter collectively referred to as "BCI") are corporations operating and transacting business within the State of Idaho.

3.      Defendant Micron Technology, Inc. (hereafter "Micron") is a corporation operating and transacting business within the State of Idaho and it maintains the Micron Technology, Inc. Self-Insured Group Plan – PPO 200 Medical Plan (hereafter "the Plan"), a constituent plan of the Micron Technology, Inc. Health and Welfare Benefits Plan.

4.      The Plan is an employee welfare benefits plan under 29 U.S.C. §1001, *et seq*., the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan's covered services include medical and surgical services, and mental health and substance use disorder services.

5.      Micron is the Plan Sponsor as defined in the Plan. Micron is also the Plan Administrator, which the Plan defines as "the sole fiduciary of the Plan, has all discretionary authority to interpret the provisions and control the operation and administration of the Plan within the limits of the law. All decisions made by the Plan Administrator, including final determination of Medical Necessity, shall be final and binding on all parties."

6.      As defined in the Plan, BCI is the third party Contract Administrator Micron hired to perform claims processing and other administrative services in relation to the Plan.

7.     As a full-time employee of Micron, Craig H. is a participant in the Plan, and his son A.H. is a beneficiary of the Plan for the benefit periods January 1, 2022 through December 31, 2022, and January 1, 2023 through December 31, 2023.

## II. JURISDICTION AND VENUE

8.     This Court has jurisdiction of this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9.     Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) and (c)(2) based on ERISA's venue provisions, and because all Defendants reside in the judicial district of Idaho and are thus subject to this Court's personal jurisdiction.

## III. BACKGROUND FACTS

### A.H.'s Developmental and Medical Background

10.     In 2005, Craig H. and his wife, Lori H., adopted A.H. when he was 9 weeks old. A.H. was often irritable as an infant and toddler. Craig H. and Lori H. also noticed that A.H. was easily distracted, preferred to play alone, and had difficulty interacting with others. As A.H. developed, his parents tried to help A.H. engage with his siblings and other children through play, sports, and other extracurricular activities.

11.     In 2016 at the age of ten (10), A.H. underwent a psychological evaluation and was diagnosed with ADHD (predominantly inattentive presentation) and Unspecified Disruptive Behavior Disorder. The clinical psychologist recommended A. H. receive structured academic support in the form of an Individual Education Plan (IEP) or 504 plan, supportive counseling services, and occupational therapy. A.H.'s parents facilitated all of these recommendations for

A.H., as well as regular visits with a child psychiatrist for prescription medication management and mood regulation.

12.    For the next five years, A.H. continued to struggle academically and socially. His parents provided support and encouragement to ensure he stayed on task and completed his school assignments. A.H. was overwhelmed in many social situations, had difficulty maintaining friendships, lost interest in most extracurricular activities and preferred to be left alone. Around the age of 14, he exhibited frequent disruptive behavior, emotion dysregulation, and executive functioning deficits, despite adjustments to his prescribed medications, academic accommodations, and regular outpatient individual and family therapy.

13.    In August 2021, at the age of 15, A.H. underwent a second psychological evaluation. The licensed psychologist diagnosed A.H. with intermittent explosive disorder, major depressive disorder, disruptive mood dysregulation disorder, adjustment disorder with anxiety, autism spectrum disorder ("ASD"), and ADHD (by history).

14.    Also in or about August 2021, A.H. started high school and continued experiencing academic, social and emotional difficulties. The school psychologist conducted a separate psychological examination of A.H. which indicated processing speed weakness, significant problems related to ADHD symptoms, atypical behaviors, and pronounced executive function deficits. Based on these results, the school's IEP/evaluation team determined A.H. was eligible for special education services.

15.    In November 2021, A.H. attempted suicide at home. A.H.'s parents took him to the local emergency room for treatment and evaluation. The ER team determined A.H. should be treated at an inpatient acute psychiatric facility for his serious mental health issues. No beds were

available in any of the adolescent psychiatric facilities in Idaho, so A.H. and his mother remained in the ER until late the next day when a bed became available in a facility several hundreds of miles away from their home. A.H. was transported to that adolescent psychiatric hospital where he spent ten (10) days for treatment of his mental health issues. Upon discharge, A.H.'s psychiatrist, physician and mental health providers recommended A.H. receive continued mental health treatment in a residential treatment facility.

16.     In December 2021, A.H. was admitted to Newport Academy ("Newport"), a residential treatment center ("RTC") in Orange, California. Newport is an in-network provider under the Plan. Newport obtained the required prior authorization from BCI for A.H.'s admission to the RTC.

17.     Thereafter, Newport submitted concurrent reviews per BCI's requests so BCI could determine if continued RTC treatment was still medically necessary. BCI authorized A.H.'s continued treatment – usually in 7 day increments – until February 2, 2022, when BCI determined that additional treatment at the RTC level of care was no longer medically necessary.

18.     Newport exercised its appeal rights under the terms of the Plan by completing a peer-to-peer review and subsequent expedited appeal to challenge BCI's adverse benefits determination. BCI denied both appeals and upheld its determination that A.H.'s treatment at Newport was no longer medically necessary. A.H. was discharged from Newport on February 5, 2022 with a recommendation by his treatment team that he enroll in a partial hospitalization program ("PHP") upon his return home.

19.     On or about February 22, 2022, A.H. was admitted to an in-network PHP in Boise, Idaho. A.H. participated in the PHP program 6-7 hours each day, Monday through Friday.

The PHP provider obtained the requisite initial prior authorization and submitted concurrent reviews for A.H.'s continued treatment per BCI's requests.

20.     On March 24, 2022, BCI denied the PHP provider's request for 10 PHP sessions between March 21, 2022 and April 4, 2022. Dr. Eleni Maneta, a psychiatrist who practices in Uniontown, Pennsylvania and Boston, Massachusetts, and whose signature block identified herself as part of BCI's "Healthcare Operations", issued an adverse benefits determination letter dated March 24, 2022, and concluded that A.H.'s medical records did not show a problem with daily living. On March 30, 2022, the PHP provider arranged for a peer-to-peer review between the psychiatrist treating A.H. and Dr. Maneta. A.H.'s treating psychiatrist explained that A.H. was struggling with gender dysphoria leading to arguments with his family, which resulted in A.H. cutting himself on March 15, 2022, and then reported suicidal ideation and self-harm urges on the day of the peer review, March 30, 2022. A.H. also struggled with activities of daily living due to his depression and hopelessness. Based on this information – some of which occurred _after_ the relevant review period, Dr. Maneta overturned her initial denial and approved the 10 PHP sessions as medically necessary under the terms of the Plan.

21.     A.H. spent approximately six (6) weeks in the PHP program and was discharged on April 1, 2022 with a written safety plan.

22.     On or about April 7, 2022, A.H.'s mother took A.H. back to the local emergency room after he told her he was having intense thoughts of suicidal ideation and self-harm. On April 8, 2022, A.H. was admitted to another inpatient adolescent psychiatric hospital and spent twelve (12) days there to stabilize his severe major depressive disorder symptoms. BCI approved

all 12 days of A.H.'s treatment at the psychiatric hospital as medically necessary under the terms of the Plan.

23.     Between April 20 and July 21, 2022, A.H. resumed weekly outpatient therapy visits with his in-network psychologist and monthly telehealth visits with his in-network psychiatrist. All of these visits were covered per the terms of the Plan. Nonetheless, A.H.'s mental health, unsafe behavior and volatile mood worsened.

24.     A.H.'s suicidal ideation, mood dysregulation, depression and/or unsafe behavior continued to intensify. None of these out-patient, short-term modes of treatment helped A.H. effectively address and manage his disorders and diagnoses.

25.     On or about July 13, 2022, A.H.'s mother Lori H. called the police after she discovered A.H.'s communications (by video and in private chat windows) in several online sex chatrooms with adult males. Some of these adults knew A.H. was a minor, requested A.H. send nude photos of himself (which he did), and one adult male emailed A.H. directly to arrange for them to meet in person.

26.     Shortly thereafter, A.H.'s psychologist in Boise recommended that A.H. be admitted to a long-term residential treatment facility (RTC) because of the escalation in A.H.'s unsafe behavior.

27.     Lori H. worked closely with an assigned BCI case manager to find an appropriate RTC that treats adolescent males with ASD, a multitude of other mental health disorders, and problematic sexual behavior.

28.     A.H.'s parents wanted to find an in-network provider (like Newport) due to the exorbitant cost of out-of-network RTCs. Lori H. called and emailed every in-network RTC the

BCI case manager provided her. There were no facilities in Idaho, and the out-of-state, in network facilities did not treat all of A.H.'s disorders and behaviors, or they would not admit A.H. because of his maladaptive sexual behavior. One potential in-network RTC that seemed to meet all of A.H.'s needs initially told Lori H. that A.H. could be admitted in sixty (60) days, but Lori H.'s and the BCI case manager's follow up emails and calls were never returned.

29.     Lori H. then did her own exhaustive research to find a facility that could adequately treat all of A.H.'s diagnoses and problematic behaviors. Lori H. found two RTCs in Utah that specialized in the treatment of adolescent males with mental health issues, including ASD, and problematic sexual behavior. Both of these RTC treatment programs average 9-12 months in length depending on the patient's situation and responsiveness to treatment. Both RTCs are inpatient, out-of-network providers.

30.     Throughout Lori H.'s regular communications with BCI, Lori H. repeatedly asked BCI what the H. family's cost would be for an inpatient out-of-network RTC per the out-of-network benefits of their Plan. No one at BCI could, or would, provide her that information.

31.     On or about July 22, 2022, the case manager's supervisor called Lori H. to discuss the general billing process for out-of-network providers, as well as the lack of in-network providers available to treat A.H.'s multiple diagnoses and maladaptive behaviors. The BCI case manager then called Lori H. later that day to report that two other potential in-network providers in Idaho could not treat A.H. because one only treated females, and the other only treated adults.

32.     With no available in-network providers, A.H.'s parents told the BCI case manager that they would contact Oxbow Academy ("Oxbow") – one of the out-of-network RTCs in Utah – to arrange A.H.'s admission.

**A.H.'s Treatment at Oxbow and BCI's Denials of Continuing Care**

33.     On or about July 26, 2022, Oxbow obtained the requisite prior authorization for

A.H. to be admitted for treatment. BCI then negotiated and executed a single case agreement

("SCA") with Oxbow (which Micron approved), which specified the per diem allowances for

two levels of care at Oxbow – RTC and PHP.

34.     The SCA provides a definition for two RTC levels of care that would apply to

A.H.'s treatment at Oxbow. Specifically:

> Residential Treatment Care (RTC): Clinically managed high intensity
> residential services. The severity of an individual's psychiatric/SUD
> symptoms no longer puts the individual at risk of being a danger to self or
> others; *readmission to an acute level of care would be likely*. It requires
> 24-hour nursing supervision with at least weekly physician/prescriber
> visits for continuous assessment and treatment of
> symptom/behavior/cognitive change and medication management *This
> level of care is often referred to as sub-acute*. It incorporates
> approximately 36 hours of clinical activities seven days a week in a closed
> environment where Physician and emergency services are available 24
> hours a day, 6 days per week. Interdisciplinary staff is comprised of
> physicians/prescribers, nurses, client support specialist, certified
> counselors, addiction specialists, licensed mental health providers and a
> discharge planner under the direction of a medical director.
>
> Partial Hospitalization (RTC): The severity of psychiatric symptoms no
> longer puts an individual at risk of being a danger to self or others. This
> level of care doesn't require 24-hour nursing supervision. *It does still
> require a high level of psychiatric services to remain in an acute setting*.
> Individuals must receive 20 hours of psychiatric services per week
> including weekly physician evaluation and medication management.
> Typically individuals receive  4 – 6 hours per day, at least (5) days per
> week. PHP services require prior authorization by BCI and will be
> reimbursed as follows: Full day PHP - $800.00 per diem (revenue code
> 0913).

(italics added).

35.     The SCA further specifies that benefits for A.H. would be "according to the terms of their individual member contract at the time of service, as well as any prior authorization issued contemporaneously and in reliance on this Agreement (if any)." The SCA also indicates that the agreement is allowed pursuant to the terms of A.H.'s member contract and is made "based on the unique facts of this case and does not apply to any other subscriber or member."

36.     The SCA specifies that Oxbow would "comply with all Provider Administrative Policies ('PAPs') issued by BCI and in effect at the time the service(s) described in this single case agreement is or are provided." The SCA provides that the PAPs could be accessed on BCI's website, and the SCA incorporated them by reference only.

37.     The SCA was signed by both John Worley, VP of Provider Network Management for BCI and Breanna Englebrecht, Director of Utilization Review for Oxbow.

38.     An email dated August 18, 2022 from Sarah Hart, BCI Director Provider Network Management, to John Worley, specifies "With Micron's attached approval, I approve. John please review for approval." Mr. Worley replied that same day: "Approved."

39.     Upon intake, Oxbow's psychiatric physician's assistant conducted an initial psychiatric evaluation of A.H. and opined that "[A.H.] has continued to display a pattern of severe impairment which demonstrates the clinical need for 24-hour structure, supervision, and active treatment to prevent a continued deterioration of the condition and subsequent necessity of inpatient care if not in residential treatment."

40.     BCI approved the first three weeks of A.H.'s treatment at the RTC level of care, but on or about August 17, 2022, Dr. Kenneth Marks, a physician in Milledgeville, Georgia and whose signature block identifies him as part of BCI's "Healthcare Operations", issued an adverse

benefits determination letter to A.H. denying Oxbow's concurrent review request for another

seven (7) days of treatment at the RTC level.

41.    Dr. Marks' letter states that he used "Change Healthcare 2022 InterQual Criteria

for Behavioral Health: Child and Adolescent Psychiatry – Residential Treatment Center –

Episode Week 1, Episode Week2 and Episode Week 3-X Extended Stay" ("RTC InterQual

Criteria") to make his decision.

42.    Dr. Marks' adverse benefits determination letter does not specifically reference or

mention medical necessity, which the H. Family's Plan defines as follows:

> **Medically Necessary (or Medical Necessity)**—the Covered
> Service or supply recommended by the treating Provider to
> identify or treat a Participant's condition, Disease, Illness or
> Accidental Injury and which is determined by Blue Cross of Idaho
> to be:1. The most appropriate supply or level of service,
> considering    potential benefit and harm to the Participant.
>
> 2. Proven to be effective in improving health outcomes;
>        a. For new treatment, effectiveness is determined by
>        peer reviewed scientific evidence;
>        b. For existing treatment, effectiveness is
>        determined first by peer reviewed scientific
>        evidence, then by professional standards, then by
>        expert opinion.
>
> 3. Not primarily for the convenience of the Participant or
> Provider.
>
>  4. Cost Effective for this condition.
>
> The fact that a Provider may prescribe, order, recommend, or
> approve a service or supply does not, in and of itself, necessarily
> establish that such service or supply is Medically Necessary under
> this Plan.
>
> The term Medically Necessary as defined and used in this Plan is
> strictly limited to the application and interpretation of this Plan,
> and any determination of whether a service is Medically Necessary

hereunder is made solely for the purpose of determining whether services rendered are Covered Services.

In determining whether a service is Medically Necessary, Blue Cross of Idaho considers the medical records and, the following source documents: Blue Cross Blue Shield Association Center for Clinical Effectiveness (CCE) assessments, the Blue Cross and Blue Shield Association Medical Policy Reference Manual as adopted by Blue Cross of Idaho, and Blue Cross of Idaho Medical Policies. Blue Cross of Idaho also considers current published medical literature and peer review publications based upon scientific evidence, and evidence-based guidelines developed by national organizations and recognized authorities.

43.     The Plan's definition of "Medically Necessary" references unspecified "evidence-based guidelines developed by national organizations and recognized authorities", but does not expressly reference, mention, or incorporate RTC InterQual Criteria.

44.     Dr. Marks' August 17, 2022 adverse benefits determination letter then explained that A.H.'s medical records "did not show him being hostile in most interactions, being unresponsive to staff direction or limits, being aggressive or being sexually inappropriate. Your records did not show you are receiving all the required services for RTC level of care such as group, individual or family therapy at least 3 times a week or a school or vocational program. Finally, your records did not include a behavior contract or symptom management plan. Your records did not show why you could not be treated in a lower level of care such as Intensive Outpatient Program (IOP)."

45.     The medical records Dr. Marks purportedly reviewed include A.H.'s treatment team and staff members noting that: 1) "there are often times when [A.H.] is oppositional and will refuse [therapy] … [A.H.] becomes annoyed by other students at times and … feels like he would like to hit others to make them stop being annoying…." 2) "[A.H.] expresses desires to

become violent to others when annoyed and reports urges to self harm. He is unable to identify

reasons to remain safe…." and 3) "[A.H.] asks general and highly concerning questions about

suicide while at the facility and does not explain why he is curious about what will happen if he

were to commit suicide while in treatment." The medical records also included notes from

A.H.'s group, individual and family therapy sessions that *were* held at least 3 times in the

previous week (contrary to Dr. Marks' letter), and a student success plan and shift notes about

his behavior in school between August 9, and August 16, 2022. Oxbow had also provided BCI

A'H.'s treatment plan, treatment plan review, and master treatment plan.

46.     On August 17, 2022 – the same day Oxbow received a copy of the adverse

benefits determination letter – Oxbow requested a peer-to-peer review with a BCI "physician or

other appropriate reviewer" to discuss BCI's decision. Oxbow had to leave several voicemails

with BCI's healthcare operations department before BCI finally arranged the peer review on

August 24, 2022. At 3pm MST, Dr. Marks briefly spoke to Oxbow's clinical director regarding

his decision to deny A.H. additional days of RTC care. At 4:29pm MST, BCI faxed Oxbow its

written decision that "our medical director upheld the denial for continued stay in RTC level of

care."

47.     Upon information and belief, on or about August 25, 2022, Oxbow's utilization

review manager called BCI's healthcare operations regarding its decision to deny A.H.'s

continued RTC level of care, and asked how she could file an appeal. The BCI employee

directed her to page 3 of the August 17, 2022 adverse benefits determination letter which

describes a *participant's* appeal rights, not the provider's appeal rights. The BCI employee also

told the Oxbow utilization review manager she could email grievancesandappeals@bcidaho.com, which is an email address for *participant's* appeals.

48.    On or about August 30, 2022, BCI approved A.H. "stepping down" to the PHP level of care as prescribed in the SCA. BCI initially approved 14 days of PHP treatment.

49.    On or about September 7, 2022, BCI approved Oxbow's concurrent review request for an additional 14 days of PHP treatment for A.H. BCI approved this request as medically necessary.

50.    On or about September 20, 2022, Oxbow submitted another concurrent review and requested an additional 14 days of PHP treatment for A.H.

51.    On September 21, 2022, BCI requested from Oxbow all group notes between September 13 and September 19, 2022, the medical doctor's notes between September 13 and September 19, 2022, a copy of A.H.'s updated treatment plan, and a copy of A.H.'s safety plan.

52.    On September 22, 2022, Oxbow faxed BCI the group notes between September 13 and September 21, 2022, A.H.'s master treatment plan, and psychiatric progress notes from September 7 and September 21, 2022.

53.    On or about September 23, 2022, Dr. William Holmes, a physician who practices psychiatry in or around Austin, Texas, performed an "external review" of A. H.'s medical records that BCI sent to him regarding Oxbow's request for an additional 14 days of PHP level of care.

54.    On the same day, Dr. Holmes issued an adverse benefits determination letter to A.H. denying Oxbow's request for continuing PHP level of care because "the medical records we received from your healthcare provider did not show us why you need more PHP treatment."

Dr. Holmes stated that he used "Change Healthcare 2022 InterQual Criteria for Behavioral Health: Child and Adolescent Psychiatry – Partial Hospitalization Program – Episode Week 3-X Extended Stay" ("PHP InterQual Criteria") to make his decision, and his signature block identified himself as part of BCI's "Healthcare Operations."

55.     Dr. Holmes' adverse benefits determination letter identified only two reasons why A.H.'s medical records did not satisfy the PHP InterQual Criteria for medical necessity: 1) the records "did not show problems with daily living in the past week such as thoughts of harming yourself or others"; and 2) "[y]our records did not show concerns (symptoms) such as anxiety that prevents you from attending groups or temper outbursts or threatening behavior."

56.     The medical records Dr. Holmes purportedly reviewed include A.H.'s treatment team and staff members noting that: 1) "[A.H.] is a danger to himself and must be watched by the staff. He continues to have thoughts of self harm and suicide. There [was] a day during the last week that he did not want to go to school and do school work. When asked to go to school he tore off his shirt and scratched his shoulders, arms and chest which his fingernails leaving visible scratch marks on himself." 2) "[A.H.] often has thoughts of hurting others and has yelled at peers… He continues to report very high levels of aggression and aggressive thoughts towards others and needs support and redirection when in moments of distress."; 3) "[A.H.] has current thoughts of suicidal ideation and a self harm attempt. [A.H.] is also in his evaluation period and is considered high risk until the data gathered through this period can be assessed."; 4) "[A.H.] struggled at rec therapy with the horses today. He was being disrespectful towards the animals."; and 5) "[A.H.] said he refuses to accept, listen to, or work with this program … [he] said really

concerning things about self harming behaviors. He repeatedly stated 'I wouldn't self harm where you would be able to see.'"

57.     On September 23, 2022 – the same day BCI faxed Oxbow a copy of the adverse benefits determination letter - Oxbow requested an <u>urgent</u> peer-to-peer review with a BCI "physician or other appropriate reviewer" to discuss BCI's decision to deny additional PHP care for A.H. Once again, Oxbow had to follow up several times with BCI's healthcare operations department before BCI finally arranged the peer review on September 29, 2022. At 3pm MST, Dr. Darlene Guerrier, a physician board certified in general psychiatry located in Staten Island, NY, briefly spoke to A.H.'s therapist regarding Dr. Holmes' decision to deny A.H. additional days of PHP care. At 4:45pm MST, BCI faxed Oxbow its written decision that "the denial for continued PHP was upheld by our medical director."

**The H. Family Has Exhausted Its Administrative Appeals Per The Terms Of The Plan**

58.     In both adverse benefits determination letters, BCI informed the H. Family about their rights to appeal the adverse determination of benefits decisions per the terms of the Plan.

59.     Craig H. and Lori H. did not agree with BCI's decisions denying continuing RTC and PHP treatment for A.H.

60.     On or about September 20, 2022, Lori H. emailed BCI's Grievances and Appeals department asking about the peer-to-peer review regarding the RTC adverse benefit determination. BCI considered Lori H.'s inquiry a first level appeal of the RTC adverse benefit determination. On September 23, 2022, BCI sent a letter to Lori H. that it was "reviewing the appeal we received on September 20, 2022" and that it would respond within 15 days of the date they received the appeal, or by October 5, 2022.

61.     On or about September 27, 2022, Lori H. emailed BCI's Grievances and Appeals department informing BCI of her first level appeal of BCI's PHP adverse benefit determination.

62.     BCI sent a letter to Lori H. dated September 29, 2022 in which they stated they were "reviewing the appeal we received on September 27, 2022, about A.H.'s [PHP] prior authorization" and that it would respond within 15 days of the date they received the appeal, or by October 12, 2022.

63.     On October 1, 2022, Lori H. emailed BCI's Grievance and Appeals department her first level appeal letters regarding BCI's denials of additional RTC and PHP care for A.H. The supporting documents and medical records related to these two first level appeal letters were so voluminous that Lori H. hand delivered these documents to BCI on Monday, October 3, 2022.

64.     The first level appeal letters described A.H.'s detailed behavioral and treatment history chronicling his mental health struggles and myriad diagnoses.

65.     The first level appeal letters referenced and included detailed documentation and specific references to A.H.'s Oxbow medical records to refute each of the BCI medical directors' findings that RTC and PHP continuing care was no longer medically necessary. Craig H. and Lori H. provided A.H.'s medical records (all of which Oxbow had previously provided to BCI) as evidence that A.H's continued treatment at Oxbow was medically necessary. They also included a copy of an email the Oxbow nurse sent to Craig H. and Lori H. summarizing the psychiatric physician assistant's visit with A.H. on September 14, 2022 wherein she noted A.H. reported thoughts of hurting himself and others.

66.     On October 4, 2022, BCI's Grievances and Appeals department sent a letter to Lori H. to inform her they were extending "your appeal due date by 15 days for [RTC] prior

authorization." In addition, the letter attempted to justify BCI's power to unilaterally extend the review period: "Per Idaho Department of Labor regulations 29 CFR §§2560.503-1 (f)(2)(iii)(A)(B) Claims Procedure, we can request a 15-day extension if we find it is necessary due to unexpected events and if we notify the claimant before the initial 15-day period expires. We will send you our decision in writing no later than October 20, 2022."

67.    BCI's justification was nonsensical: the Idaho Department of Labor does not have any authority or responsibility regarding the appeals process set forth in the Plan. The CFR citation in BCI's October 4, 2022 letter refers to the Code of Federal Regulations, and specifically the rules regarding the claims procedure for benefit plans covered by ERISA. However, the specific subsections referenced – 2560.503-1 (f)(2)(iii)(A)(B) – apply to the timing of notifying a claimant (like A.H.) about the plan's initial adverse benefit determination, not the timing of responding to a claimant's request for review or appeal of such adverse benefit determination.

68.    29 CFR § 2560.503-1(i)(2)(ii) specifies when a group health plan like the H. Family's Plan must provide a response to a claimant's request for review of the adverse benefits determination. According to this rule, if the plan provides for two appeal levels, like the H. Family's Plan does, then the plan must notify the claimant of its benefit determination being reviewed "not later than 15 days after receipt by the plan of the claimant's request for review of the adverse determination." BCI already determined that the email Lori H. sent to BCI on September 20, 2022 constituted her first level appeal regarding the denial for continued RTC treatment. Under this rule, BCI was required to provide its response by October 5, 2022. The rule

does not allow BCI any extension of time to respond to a claimant's appeal like BCI claimed in its October 4, 2022 letter.

69.     Nevertheless, on October 12, 2022, BCI's Grievances and Appeals department sent another letter to Lori H. to inform her they were extending "your appeal due date by 15 days for [PHP] prior authorization." In addition, this letter, like the October 4th letter, nonsensically stated: "Per Idaho Department of Labor regulations 29 CFR §§2560.503-1 (f)(2)(iii)(A)(B) Claims Procedure, we can request a 15-day extension if we find it is necessary due to unexpected events and if we notify the claimant before the initial 15-day period expires. We will send you our decision in writing no later than October 27, 2022."

70.     The email Lori H. sent to BCI on September 27, 2022 constituted her first level appeal regarding the denial for continued PHP treatment. Under this rule, BCI was required to respond by October 12, 2022. The rule does not allow BCI any extension of time to respond to a claimant's appeal like BCI claimed in its October 12, 2022 letter.

71.     In a letter dated October 20, 2022, (8 days after the October 12 deadline), Dr. Michael Oberdoerster, a BCI Medical Director who practices medicine in Dayton, Ohio, informed Lori H. that BCI had reconsidered its denial of A.H.'s PHP continued care and upheld its determination that such care is not medically necessary. Dr. Oberdoerster stated that he reviewed Lori H.'s first level appeal letter, the documents Lori H. hand delivered to BCI on October 3, 2022, 146 pages of A.H.'s medical records Oxbow submitted, and recent faxes and emails. Dr. Oberdoerster's denial letter stated that A.H.'s clinical records did not show the clinical, functional and intervention findings to meet PHP Interqual Criteria because: 1) Lori H. described an incident of nonsuicidal self—injury (A.H. scratching himself) that occurred

September 22, 2022 which Oxbow did not include in the clinical records and "a family member's personal recount is not a clinical finding"; 2) A.H.'s medical records did not show that he was being accusatory in most interactions, had interpersonal conflict with frequent angry outbursts, or poor and intrusive boundaries; 3) the psychiatric P.A.'s notes dated September 21, 2022 reported A.H. had "some" depression but no suicidal ideations; 4) the medical records did not include a psychiatric report between September 13 – September 19, 2022; 5) the facility did not provide a safety plan; and 6) the medical records did not show the credentials for the individuals providing structured therapy programming, or documentation for the requisite 15 hours of therapy.

72.     Dr. Oberdoerster's first level appeal denial included additional rationale that was not addressed in Dr. Holmes' initial adverse benefits determination letter, some of which were also incorrect or inconsistent with Dr Holmes' findings. Dr. Oberdoerster's denial thus violated 29 CFR Sec. 2560.503-1(h)(2) and 2590.715(b)(2)(ii)(C).

73.     In a letter dated October 27, 2022 (22 days after the October 5 deadline), the same Dr. Michael Oberdoerster informed Lori H. that BCI had reconsidered its denial of A.H.'s RTC care for the week of August 16 – August 22, 2022. Dr. Oberdoerster explained that BCI reversed its adverse benefit determination regarding the RTC level of care because it determined that Lori H.'s first level appeal established medical necessity under the terms of the Plan.

74.     On or about November 17, 2022, and per the terms of the Plan, the H. Family submitted their second level appeal to the Grievances and Appeals Specialist requesting further review of BCI's denial of continuing PHP treatment for A.H., and arguing that A.H.'s medical records for the concurrent review period met the PHP InterQual Criteria for medical necessity.

75.      Lori H. listed all the arguments and issues raised in the first level appeal that BCI
failed to address, and the additional bases for the second level appeal. Lori H. identified all the
notes in A.H.'s medical records (for the concurrent review period) which met the PHP InterQual
Criteria for continuing care, and Lori H. corrected Dr. Oberdoerster's inaccurate assertion in the
October 27 letter.

76.      In the second level appeal, the H. Family also submitted documentation from the
following treatment providers recommending that A.H. needed long term treatment for his
myriad mental health issues and problematic sexual behavior: 1) Dr. Brett Thomas, the Boise
psychologist who treated A.H. prior to his admission to Oxbow; 2) Lorraine Brimhall, the
Oxbow psychiatric P.A. who conducted weekly visits with A.H.; and 3) Dr. Russell Hyken, a
psychologist who conducted a Comprehensive Needs and Risk Assessment/Psychosexual
Evaluation of A.H. in November 2022.

77.      On November 22, 2022, BCI emailed Lori H. two separate letters, and sent by
overnight mail a large set of documents and an audio file of some recorded phone calls between
BCI and Lori H. and Craig H. These materials were provided in response to Lori H.'s numerous
requests for copies of all documents and communications related to BCI's denials of continuing
RTC and PHP care for A.H.

78.      One of the letters was a "supplemental letter" dated November 22, 2022, and
signed by Dr. Oberdoerster. This supplemental letter appears to be a significantly revised version
of Dr. Oberdoerster's October 20, 2022 letter which denied the H. Family's first level appeal for
continued PHP treatment. BCI provided no explanation as to why it sent the revised letter, nor
did it cite to any ERISA rule or regulation which authorized or allowed the plan to send the

claimant a "supplemental" letter 32 days after the original denial letter was sent, and five (5) days after the claimant had already submitted their second level appeal.

79.     After Lori H. reviewed the documents and two letters, she emailed BCI on December 6, 2022 and included five (5) additional comments or questions to the second level appeal.

80.     On December 7, 2022, BCI's Grievance and Appeals department emailed Lori H. to confirm that it would now process the H. Family's second level appeal.

81.     In a letter dated December 21, 2022 sent to Lori H., BCI's Grievance and Appeals Supervisor explained that Dr. Monique Ribeiro, a psychiatrist in Boston, Massachusetts who works part-time as a BCI Medical Director, reviewed "the medical records and other information you provided" with the second level appeal and determined that A.H.'s symptoms did not meet the PHP InterQual Criteria for medical necessity. Dr. Ribeiro did not sign the denial letter, and the BCI Supervisor's summary of Dr. Ribeiro's external review for medical necessity indicates that it was limited to "clinical records" only. The denial letter did not indicate that Dr. Ribeiro had considered any of the new information the H. Family provided in its second level appeal, nor did the denial letter address any of the additional questions and comments Lori H. included in her December 6, 2022 email to BCI as part of the second level appeal.

82.     BCI informed the H. Family that they had exhausted the internal appeal process under the Plan, and that they had the right to request an independent external review through the Idaho Department of Insurance, or to file a civil action under ERISA.

**The Plan Documents Are Inconsistent Regarding Fiduciary Roles and Responsibilities**

83.     The Plan states that Micron, as Plan Administrator, is the sole fiduciary and has

all discretionary authority to interpret the provisions of the Plan, and to control the operation and

administration thereof. The Plan also states Micron can make the final determination of Medical

Necessity, which shall be final and binding on all parties.

84.     On or about September 29, 2022, Craig H. emailed Denice Stull, the Micron

Senior Benefits Manager, regarding the H. Family's ongoing frustrations with BCI and its

confusing appeals process, failure to answer the H. Family's questions or provide requested

documents, and its continuing denial of care for A.H. Craig H. also requested Micron's

assistance in resolving these issues.

85.     In response, Ms. Stull explained that because Micron has contracted with BCI to

be its Third Party Administrator of the Plan, Micron is "not involved in any personal health

situations and [BCI] is solely responsible for all clinical and professional benefit determinations

of how claims are to be processed under our Plan…." As to Craig H.'s request for assistance,

Ms. Stull stated that "Micron does not intervene, interfere or advise in individual medical

professional matters regarding the Administration of our Plan." Ms. Stull's explanation conflicts

with the Plan language which specifies that Micron is the sole fiduciary and has all discretionary

authority to interpret the provisions of the Plan, and to make final determinations of Medical

Necessity.

86.     On or about October 5, 2022, Lori H. emailed Ms. Stull at Micron and requested

copies of: 1) all documents, records, and other information that are relevant to the H. Family's

appeals of BCI's RTC and PHP adverse benefit determinations; and 2) the full plan documents

between Micron and BCI for the Plan, including plan documentation about the Plan's mental health services and the criteria BCI uses to determine medical necessity.

87.    On or about October 18, 2022, Micron mailed Craig H. and Lori H. copies of the "governing plan documents" for the Plan which consisted of: 1) the Summary of Healthcare Benefits for the Plan; 2) the Benefits Handbook; 3) an excerpt from the Service Provider Agreement between Micron and BCI; and 4) Micron's Health and Welfare Benefits Plan. Micron did not provide any of the other requested documents. Ms. Stull explained that because BCI is the claims administrator for the Plan, the H. Family should "continue to work with BCI" to obtain the documents and other information related to their appeals, BCI's denials, the Plan's mental health services and the medical necessity criteria that BCI uses.

88.    The excerpt of the Service Provider Agreement that Micron provided to Craig H. and Lori H. states: 1) "BCI acknowledges that its role in processing and paying Benefit Claims and in receiving, reviewing and resolving appeals of denial of any Benefit Claims constitutes a fiduciary role under ERISA"; 2) "[Micron] expressly delegates authority to BCI to decide all pre-service and urgent appeals. BCI shall receive, review, and resolve all pre-service and urgent appeals that exhaust all of the Participant's internal appeal rights under the Plan."; and 3) "BCI is the designated appeals fiduciary and shall make the final benefit determination with regard to final appeals that exhaust the Participant's internal appeal rights under the Plan." This language conflicts with the Plan which specifies that Micron is the sole fiduciary, has all discretionary authority to interpret the provisions of the Plan, and makes final determinations of Medical Necessity.

**The H. Family's Requests for Comparative Analyses of Nonquantitative Treatment Limitations Under The Mental Health Parity and Addiction Equity Act**

89.     The Plan is covered by ERISA, and is therefore subject to the parity protections of the Mental Health Parity and Addiction Equity Act ("MHPAEA"), codified at 29 U.S.C. §1185(a).

90.     Congress enacted the Consolidated Appropriations Act, 2021 on December 27, 2020 (the "CAA"). Section 203 of Title II of Division BB of the CAA amended the MHPAEA, in part (codified at 29 U.S.C. §1185(a)(6)-(8)), by expressly requiring group health plans that offer both medical/surgical benefits and mental health/substance use disorder benefits and that impose nonquantitative treatment limitations ("NQTLs") on mental health/substance use disorder benefits to perform and document their comparative analyses of the design and application of NQTLs.

91.     The United States Department of Labor ("DOL") has issued numerous guidelines and a self-compliance tool (available at www.dol.gov) for group health plan stakeholders to understand the CAA amendments to the MHPAEA, and to facilitate compliance with the express requirement that plans conduct and document a detailed comparative analyses of the design and application of NQTLs. The DOL guidelines reiterate that a "general statement of compliance, coupled with a conclusory reference to broadly stated processes, strategies, standards, or other factors is not sufficient."

92.     On November 4, 2022 and pursuant to 29 CFR §2590.712(d)(3), the H. Family emailed separate but identical requests to BCI and Micron for copies of all "documents with information on medical necessity criteria for both medical/surgical benefits and mental health and substance use disorder benefits, as well as the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical

surgical benefits and mental health or substance use disorder benefits under the plan." The H. Family specified that the relevant benefit classification is for inpatient, out-of-network services.

93.    29 CFR §2590.712(d)(3) specifies that documents requested pursuant to that rule must be furnished to plan participants within 30 days of such request.

94.    On November 10, 2022, the BCI Supervisor in the Grievances and Appeals department emailed Lori H. and said BCI would provide the information "relevant to your claims appeal, consistent with BCI's obligations under ERISA" and anticipated doing so within the next seven business days.

95.    On December 7, 2022, BCI emailed the H. Family its "NQTL analysis" for the Plan's medically necessary criteria only. This NQTL analysis consists of a 3 page chart listing some of the definitions and descriptions for medically necessary criteria already set forth in the Plan and other BCI medical policies. The chart indicated it covered all inpatient and outpatient (in-network and out-of-network) facilities. BCI concluded that its medically necessary NQTL is in parity "with respect to medical/surgical and mental health/substance use disorder benefits both as written and in operation in all benefit classifications."

96.    BCI did not provide the H. Family any other processes, strategies, evidentiary standards, or other factors it uses to apply to the medically necessary NQTL, nor did it provide any such information for all other NQTLs it applies in writing and in operation for medical/surgical benefits and mental health or substance use disorder benefits under the Plan.

97.    On January 16, 2023, Lori H. emailed Micron and renewed her request that it provide the NQTL information requested in the November 4, 2022 email.

98.     As of the filing date of this Complaint, Micron has not provided any of the requested NQTL information to the H. Family.

99.      Because of BCI and Micron's actions, the H. Family has paid $106,385.00 toward A.H.'s medical care at Oxbow. The H. Family can no longer afford to continue to pay for A.H.'s treatment, so A.H. has been forced to discontinue treatment at Oxbow. A.H. is being denied treatment that is medically necessary.

100.     The H. Family has been damaged by the wrongful denial of A.H.'s claims, the inconsistent and conflicting information and rationale BCI provided regarding the claims procedures and appeals, the Defendants' failure to provide a full and fair review of the H. Family's appeals, and their failure to demonstrate the Plan's parity pursuant to the MHPAEA. The Defendants' denial of benefits for A.H.'s treatment and other violations of the Plan and ERISA has caused the H. Family to incur and pay A.H.'s medical expenses that should have been paid by the Plan in an amount exceeding $100,000.00.

## IV. CLAIMS FOR RELIEF

### A.  RECOVERY OF BENEFITS UNDER 29 U.S.C. § 1132(a)(1)(B)

101.     The H. Family realleges paragraphs 1 through 100 above and incorporates the same by reference herein as set forth in full.

102.     ERISA empowers a participant or beneficiary to bring a civil action to recover benefits due to him under the terms of the Plan, or to enforce his rights under the terms of the Plan. 29 U.S.C. §1132(a)(1)(B).

103.     ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a "prudent man standard of care" upon plan fiduciaries such as BCI,

acting as agent of the Plan, to "discharge [its] duties with respect to a plan solely in the interest

of the participants and beneficiaries" and "in accordance with the documents and instruments"

governing the Plan. 29 U.S.C. § 1104(a)(1).

104.    ERISA requires the Plan to set forth "specific reasons" for any participant or

beneficiary whose claim for benefits under the Plan has been denied, "written in a manner

calculated to be understood by the participant." 29 U.S.C. § 1133(1).

105.    ERISA also underscores the particular importance of accurate claims processing

and evaluations by requiring that appropriate named fiduciaries provide a "full and fair review"

of claim denials. 29 U.S.C. § 1133(2).

106.    Defendants breached their fiduciary duties to A.H. when they failed to comply

with their obligations under 29 U.S.C § 1104 and 29 U.S.C. § 1133 to: 1) act solely in A.H.'s

interest and for the exclusive purpose of providing benefits to ERISA participants and

beneficiaries; and 2) to provide a full and fair review of their decision denying A.H.'s claims.

107.    The actions of Defendants in failing to provide coverage for A.H.'s medically

necessary treatment are a violation of the terms of the Plan and its medically necessary criteria.

Plaintiffs are entitled to recover the benefits due to A.H. under the terms of the Plan.

### B. CLAIM FOR EQUITABLE RELIEF UNDER 29 U.S.C. § 1132(a)(3)

108.    The H. Family realleges paragraphs 1 through 107 above and incorporates the

same by reference herein as set forth in full.

109.    ERISA also specifies that participants or beneficiaries may pursue alternative

claims of relief: "(A) to enjoin any act or practice which violates any provision of this subchapter

or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such

violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. §1132(a)(3).

110.    For plans covered by ERISA and "in accordance with the authority of … 29 U.S.C. 1133," the Department of Labor Regulation 29 C.F.R. §2560.503-1 "sets forth the minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." 29 C.F.R. §2560.503-1(a). Such plans must "establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations." 29 C.F.R. §2560.503-1(b).

111.    29 C.F.R. § 2590.715 further requires that when a final adverse benefit determination is based on a new or additional rationale, a "full and fair review" of the claimant's appeal (set forth in 29 C.F.R. §2560.503-1(h)(2)) mandates that the claimant be provided with the new or additional rationale, and in time for such claimant to have a reasonable opportunity to respond before the final adverse benefit determination is issued. 29 C.F.R. § 2590.715(b)(ii)(C).

112.    Defendants have violated the following sections of 29 C.F.R. § 2560.503-1:

a.    The Plan and BCI failed to consistently apply administrative processes and safeguards in such a way as to ensure and verify that the adverse benefit claim determinations were made in accordance with governing plan documents. 29 C.F.R. § 2560.503-1(b)(5).

b.    By providing the H. Family with a "supplemental response" from Dr. Oberdoerster on November 22, 2022, BCI interfered with the proper administration of the Plan's claim procedures which limited the claimants

to filing no more than two appeals of an adverse benefit determination. 29 C.F.R. § 2560.503-1(c)(2).

c.    BCI and the Plan administrator failed to reference the specific plan provisions on which the denial of benefits was based; failed to include additional material or information necessary for the H. Family and Oxbow to perfect the claim; and failed to provide an explanation of why such information was necessary. 29 C.F.R. § 2560.503-1(g)(1)(i) through (v).

d.    BCI and the Plan failed to provide for a review of the H. Family's appeals that did not afford deference to the initial adverse benefit determination. 29 C.F.R. § 2560.503-1(h)(3)(ii).

e.    BCI and the Plan failed to provide the H. Family notification of the Plan's benefit determinations within 15 days after the H. Family's request for review of the respective adverse benefit determinations in their first level appeals. 29 C.F.R. § 2560.503-1(i)(2)(ii).

113.    BCI and the Plan relied on new or additional rationale for each of the adverse benefit determinations they issued to the H. Family in response to the H. Family's first and second level appeals. BCI and the Plan did not conduct a full and fair review of the H. Family's response to the additional rationale Dr. Oberdoerster included in his denial of first level appeal, nor did BCI and the Plan provide the H. Family with the additional rationale Dr. Ribeiro provided before the final adverse benefit determination was issued. 29 C.F.R. § 2590.715(b)(ii)(C).

114. Plaintiffs have been damaged by Defendants' failure to follow a reasonable claims procedure that would yield a decision on the merits of the Plaintiffs' claims. 29 C.F.R. § 2560.503-1(l)(1).

115. As a result of the above-named violations and failures, and pursuant to 29 U.S.C. 1132(a)(3), Plaintiffs are entitled to:

    a. A declaration that the actions of Defendants violated ERISA and Department of Labor Regulations 29 C.F.R. § 2560.503-1 and 29 C.F.R. § 2590.715;

    b. An injunction ordering Defendants to cease violating ERISA and the Department of Labor Regulations 29 C.F.R. § 2560.503-1 and 29 C.F.R. § 2590.715;

    c. An order requiring the reformation of the Defendants' claims benefits procedures, benefits determinations, and appeals to ensure compliance with ERISA and the Department of Labor Regulations 29 C.F.R. § 2560.503-1 and 29 C.F.R. § 2590.715; and

    d. Equitable relief in the manner of a remand to BCI regarding PHP care for A.H. at Oxbow for the dates of service from September 22, 2022 until A.H.'s discharge from Oxbow on April 30, 2023.

## C. CLAIM FOR VIOLATIONS OF MHPAEA UNDER 29 U.S.C. § 1132(a)(3)

116. The H. Family realleges paragraphs 1 through 115 above and incorporates the same by reference herein as set forth in full.

117. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

118. The MHPAEA requires ERISA plans to provide no less generous coverage for

mental health treatments than they provide for medical/surgical treatments.

119.    Specifically, the MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits. The MHPAEA also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C. § 1185a(a)(3)(A)(ii).

120.    NQTLs that may not be imposed more stringently (as written and in operation) for mental health or substance use disorder benefits (in any classification) than medical/surgical benefits include, but are not limited to: medical management standards limiting or excluding benefits based on medical necessity, network tier design, standards for provider admission to participate in a network (including reimbursement rates), plan methods for determining usual, customary and reasonable charges, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits. 29 C.F.R. § 2590.712(c)(4)(ii)(A) (C) (D) (E) and (H).

121.    Medical/surgical benefits the Plan offers that are comparable to the benefits the Plan excluded for A.H.'s mental health treatment include inpatient sub-acute treatment settings such as skilled nursing facilities and rehabilitation facilities. These medical/surgical inpatient sub-acute facilities are not excluded or restricted based on geographic location, facility type, staff rosters and credentials, or other criteria, yet BCI excluded and restricted coverage of A.H.'s mental health treatment at Oxbow.

122.    The actions of BCI, the Plan and the SCA in requiring that A.H. satisfy acute care medical necessity criteria in order to obtain coverage for PHP treatment violates the MHPAEA

because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive plan benefits.

123.    The Plan does not have a single in-state or in-network inpatient facility that could adequately treat all of A.H.'s mental health disorders, behaviors, and diagnoses. The Plan violates the MHPAEA because it fails to provide an adequate network of mental health providers and imposes stringent network admission standards, including the credentialing process, which excludes facilities like Oxbow from participating in-network, while numerous analogous medical/surgical facilities are available in-network.

124.    The Plan further violates the MHPAEA because of restrictions based on geographic location and facility type in the inpatient, out-of-network benefit classification. As part of the prior authorization review, BCI and the Plan require an out-of-state non-contracting RTC to submit state licensure documentation, a program description of services, the name of the board certified physician, a staff roster with clinical credentials, clinical information documenting the need for member's admission and an explanation why services cannot be provided at a lower level of care, and a treatment plan. Similarly, BCI and the Plan require an out-of-state non-contracting PHP or IOP provider to submit state licensure documentation, a program description of services provided, a staff roster with their current clinical credentials, and clinical information documenting the need for member's admission.

125.    BCI's internal PAP 905 - "PHP Accreditation Guidelines" (with no benefit classification specified) defines a PHP program as an "acute" day hospital. This PAP imposes these requirements for every PHP provider: 1) clinical documentation including a comprehensive

psychosocial assessment, individualized treatment plan and goals, and information regarding estimated length of stay and discharge planning; and 2) facility documentation including a staff roster with names and credentials, a copy of the license, diploma and certification for each staff member, an organizational chart, staffing information, program description, state license or certificate for the program, policies and procedures addressing life safety, quality assessment and improvement information, current annual quality assessment and improvement plan, samples of quality assurance and quality improvement monitors for each program, utilization review plan, risk management plan, documentation or owner/financial responsibility, and a state fire inspection certificate. By contrast, PAP421 – "Skilled Nursing Facility Coverage Provisions" describes five (5) different levels of SNF care and states that care in a SNF may be covered if such care is under the direct supervision of a licensed registered nurse and licensed social worker, medical services provided by a physician are directly related to the care and treatment of the patient's condition, various therapy services (e.g. physical, speech, occupational) are provided by licensed or certified therapists, the patient requires skilled nursing services on a daily basis which can only be provided in an inpatient SNF, and the services are provided pursuant a physician's orders.

126.    The above requirements are not imposed on medical/surgical treatment, but are for mental health treatment; thus, BCI's PAPs and its specific, additional requirements for out-of-state non-contracting providers violates the MHPAEA for imposing NQTLs for mental health treatment that are more restrictive than and/or not applied at all to medical/surgical treatments under the Plan.

127.    The Plan's NQTL prior authorization requirement further violates the MHPAEA

because all levels of behavioral health require prior authorization, including intensive outpatient programs and psychological evaluations, while only some medical/surgical services and procedures require prior authorization. Additionally, BCI's PAP902 requires prior authorizations for mental health RTC and PHP programs be submitted in writing, while BCI's PAP421 allows SNF prior authorizations and the preliminary individualized plan of care to be transferred verbally with a follow-up written plan required 24-48 hours later.

128.    In this manner, the Defendants violate 29 C.F.R. § 2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BCI, as written or in operation, use processes, strategies, standards or other factors to limit coverage for mental health treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

129.    The violations of the MHPAEA by BCI and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C § 1132(a)(3) including, but not limited to:

      a.    A declaration that the actions of Defendants violated the MHPAEA;

      b.    An injunction ordering Defendants to cease violating the MHPAEA and requiring compliance with the statute;

      c.    An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with the MHPAEA;

      d.    An order requiring disgorgement of funds obtained by or retained by the

Defendants as a result of their violations of the MHPAEA;

e.  An order requiring an accounting by the Defendants of the funds wrongly

withheld by each Defendant from participants and beneficiaries of the Plan as a

result of Defendants' violations of MHPAEA;

f.  An order based on the equitable remedy of surcharge requiring the Defendants to

provide payment to the Plaintiffs as make-whole relief for their loss;

g.  An order equitably estopping the Defendants from denying the Plaintiffs' claims

in violation of the MHPAEA; and

h.  An order providing restitution from the Defendants to the Plaintiffs for their loss

arising out of the Defendants' violation of the MHPAEA.

### D. REQUEST FOR STATUTORY PENALTIES FOR FAILURE TO SUPPLY REQUIRED INFORMATION UNDER 29 U.S.C. § 1132(a)(1)(A) and (c)

130.  The H. Family realleges paragraphs 1 through 129 above and incorporates the

same by reference herein as set forth in full.

131.  Pursuant to 29 U.S.C. §1185a and 29 U.S.C. §1024(b)(4), the H. Family is

entitled to request documents that Defendants are statutorily required to disclose upon a

participant's or beneficiary's request.

132.  Micron only included an excerpt of the administrative services agreement

between Micron and BCI when it provided the H. Family the "governing plan documents." The

H. Family is entitled to a copy of the complete administrative services agreement.

133.  Micron has repeatedly failed to produce documents with information on medical

necessity criteria for both medical/surgical benefits and mental health and substance use disorder

benefits, as well as the processes, strategies, evidentiary standards, and other factors used to

apply NQTLs with respect to medical/surgical benefits and mental health or substance use disorder benefits under the Plan that Plaintiffs requested.

134.    The three-page chart BCI emailed to Lori H. in response to her request for documents with information on medical necessity criteria for both medical/surgical benefits and mental health and substance use disorder benefits, as well as the processes, strategies, evidentiary standards, and other factors used to apply NQTLs with respect to medical/surgical benefits and mental health or substance use disorder benefits under the Plan is an insufficient response to demonstrate parity for the medical necessity criteria: the discrepancies noted above between medical/surgical health and mental health benefits are not addressed in what BCI sent to Lori H. Additionally, BCI has not produced any documents or information regarding the processes, strategies, evidentiary standards, and other factors BCI uses to apply all other NQTLs under the Plan.

135.    The failure of Micron to produce adequate documentation under which the Plan was operated, and to produce all documents related to all NQTLs applied under the Plan, as requested by the Plaintiffs, within 30 days of Lori H.'s November 4, 2022, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this court to impose statutory penalties up to $100 per day from 30 days from the date of Plaintiffs' requests.

### V. ATTORNEYS FEES AND COSTS

136.    The H. Family realleges paragraphs 1 through 135 above and incorporates the same by reference herein as if set forth in full.

137.    As a direct result of Defendants' wrongful denial of benefits under the Plan and failure to comply with the relevant provisions of ERISA and the MHPAEA, the H. Family has

been required to bring this action.

138.    Pursuant to 29 U.S.C. § 1132(g)(1), the H. Family is entitled to recover reasonable attorney fees and costs incurred in this action in the amount of $15,000.00 if judgment is entered by default, and in such greater amount as reasonably necessary if this matter is contested.

## VI. PRAYER FOR RELIEF

WHEREFORE, the H. Family prays for entry of judgment as follows:

1.  For a money judgment in the total amount that is owed for A.H.'s medically necessary treatment at Oxbow, plus pre and post-judgment interest to the date of payment;

2.  Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' second (B) and third (C) causes of action;

3.  For an award of statutory penalties against Micron of up to $100 a day after the first 30 days for each instance of Micron's failure or refusal to fulfill its duties to provide Plaintiffs the documents they requested;

4.  Attorneys' fees and costs incurred pursuant to 29 U.S.C. § 1132(g); and

5.  For such further relief as the Court deems just and proper.

DATED THIS 23rd day of May, 2024.


By  /s/ Ryan T. McFarland
　　 Ryan T. McFarland, ISB No. 7347
　　 Attorneys for Plaintiffs